# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 4402 | **DATE** | 6/24/2011 |
| **CASE TITLE** | Thomas M. Janusz, Jr. vs. City of Chicago *et al.* | | |

**DOCKET ENTRY TEXT**

Defendants' motion for summary judgment [273] is denied in part and granted in part. The motion is denied as to the false arrest claim (Count XI), the vehicle search claim (Count XII), the conspiracy claim (Count V), the abuse of process claim (Count IV), and the malicious prosecution claim against defendants Lucas and George (Count III). The motion is granted on the apartment search claim (Count VII) but only as against defendant Liberti and granted on the malicious prosecution claim (Count III) but only as against defendants Mugavero-Lucas and Liberti. Plaintiff's motion for leave to file the Fourth Amended Complaint [324] instanter is granted.

■[ For further details see text below.]   Docketing to mail notices.

## STATEMENT

### Introduction

Plaintiff Thomas Janusz was arrested on drug charges on December 6, 2001. The charges were later dropped after the state court judge found no probable cause for the arrest. Janusz then filed this case, asserting claims under § 1983 and state law for false arrest, abuse of process, conspiracy, and malicious prosecution. This case went through a long period of discovery in part because Janusz first tried a related civil case in state court against his employer. Now before the Court is defendants' summary judgment motion.

### Factual Background

In 1998, Janusz began working as a manager for two Chicago-based funeral homes owned by Keystone Illinois, Inc. ("Keystone"). Keystone purchased one of the homes from Anthony and Daniel Morizzo who signed non-competition agreements as part of the sale. (Plaintiff's Statement of Material Fact ("PF") 1.) While working for Keystone, Janusz claims to have found evidence suggesting the Morizzo brothers were violating their agreements. Based on these observations, Keystone filed a lawsuit against the Morizzo brothers in October 2001. Janusz was to be one of the key witnesses. At the time, Janusz told Keystone's CEO that he was worried the Morizzo brothers would retaliate against him.

On December 6, 2001, Janusz met a woman named Paula Siragusa who he later took to a motel room. Janusz's testimony on how they met has evolved. Early on, at the hearing on his motion to quash his arrest, Janusz testified that he met Siragusa at a Bally's Health Club and asked her to lunch. (Defendants' Statement of Material Fact ("DF") 9.) However later in his deposition in this case, Janusz testified that he met her at a

gas station parking lot near the "Six Corners" intersection in Chicago. (PF 5.) Janusz testified that Siragusa was dropped off by a man Janusz later identified as defendant Parris George and that Siragusa approached Janusz while he was at a pay phone. According to Janusz, even though Siragusa was "nice looking" and even though he was "no Robe Lowe by any means," Siragusa began flirting with him and asked for a ride. (Defs. Ex. H at 90-92.) Eventually, they ended up at a motel room. During this time, Siragusa received numerous calls on a pager. (PF 5.) In the early evening, they left and Siragusa allegedly told Janusz to drive to a certain gas station located at 1401 W. Roosevelt Road, just inside the township of Cicero bordering Chicago. (DF 4.)

As Janusz pulled up in the parking lot, three Chicago police officers -- defendants Alan Lucas, Parris George, and Gina Liberti -- were driving by. They happened to be in the area because they received an anonymous tip earlier in the evening that a person in a grey Toyota would be in the parking lot to make a narcotics transaction. (Defs. Ex. E at 59.) The officers noticed a black Toyota in the parking lot and saw Janusz get out of this car and put duffel bags on top of it and then observed him pacing back and forth as if he were waiting for something. (*Id.* at 58-69.) The officers parked across the intersection to observe him. At some point, they decided to approach and drove over to the lot. Sometime during this process, all three officers allegedly noticed that Janusz's license plate was expired. (DF 12.) The officers talked to both Janusz and Siragusa. According to Lucas, Siragusa described how she and Janusz spent the better part of the afternoon driving from one hotel room to another while Janusz ran up to the rooms with a duffel bag for a short period and returned to the car. Siragusa also allegedly told Lucas that Janusz smoked cocaine and had a plastic cup with cocaine in the front seat of the car. (*Id.* at 89-90.) The officers found $4,400 in cash inside the duffel bag. Janusz was placed under arrest. (DF 4.) Siragusa was not arrested, nor was a statement taken from her, nor did any of the three officers write down her address or phone number. (PF 14.) Instead, she was given $10 so she could get a ride home. In the later police report, the officers did not mention Siragusa's name nor identify her in any other way than referring to her as a "female passenger." (PF 25.) At the time, Siragusa was an admitted heroin addict who had been arrested several times. (Defs. Ex. F at 7, 38.) She also was doing drugs in the hotel that afternoon.

Janusz described the encounter differently. He testified that Lucas approached and said "I think you're a drug dealer" and then asked for the key to the motel room and asked where the gym bag was. (PF 12-13.) Because Lucas could not have known about these facts (the bag was inside the car, according to Janusz), Lucas must have learned this information from Siragusa. Janusz believes she was contacting Lucas during the afternoon with a pager to coordinate the arrest. When officers asked why he had so much cash in the bag, Janusz explained that cash payments were common in the funeral business. (PF 15.) Janusz claims that while sitting in the police car, he saw Lucas reach into his vest, remove a small plastic bag containing a white pebble-sized object which he flicked into a cup in the front seat of Janusz's car. (PF 16.) The officers did not issue Janusz a ticket for expired plates. (*Id.*)

Officers took Janusz to the 15th District police station. There, according to Janusz, he was handcuffed to an "O-ring" for an hour or more. (PF 17.) The three arresting officers were joined by a fourth, defendant Amy Mugavero-Lucas. Janusz alleges that Lucas coerced him into signing a consent form to search his apartment, which was above one of the two funeral homes he managed for Keystone. Janusz claims Lucas violently picked him up and told him something terrible would happen if he didn't cooperate. (PF 20.)

On the way to the apartment above the funeral home, Lucas allegedly turned around and said to Janusz something along the lines of: "Now, we wouldn't want this young man to end up in Cook County tonight with a bunch of spooky dos now, boys, would we?" (Pl. Ex. 2 at 417.) Janusz also claims defendant George admitted Siragusa had set him up. (PF 23.)

In their search of his apartment, the officers allegedly found crystal meth, cocaine, and illegal anabolic steroids. They also inventoried $17,810 in cash. (DF 30.) Janusz claims the officers stole $20,000 in cash and a $1,500 watch. (PF 24.)

Shortly after Janusz was arrested, a police officer named Grizzoffi made copies of Janusz's confidential police records. (PF 30.) Grizzoffi had previously worked part-time for Keystone and knew the

Morizzo brothers. (PF 29.) Anthony Morizzo received these reports in the mail five days after the arrest. (PF 30.) Allegedly relying on these reports, the Morizzo brothers sought to settle the civil lawsuit against Keystone by arguing that the drug arrest made Janusz a tainted witness. (PF 31.) Believing this to be true, Keystone settled the lawsuit. It also fired Janusz in January 2002.

In May 2002, Janusz moved to quash the arrest. A hearing was held in October with Janusz and Lucas testifying as the key witnesses. At the hearing, Janusz's counsel pointed out that Anthony Morizzo was in the courtroom and that he was involved in litigation with Janusz's employer at the time of the arrest. (Def. Reply Ex. 2 at 8.) One issue that the prosecutor focused on heavily was whether Janusz's license plates were expired. (*Id*. at 5, 12. 19, 22-25.) Janusz testified several times that they were not. (*See id.* at 5 ("Q. Were the license plates current? A. Yes, they were."). However, as demonstrated by the records of the Illinois Motor Vehicle Records Division, which were late submitted as evidence in this case (Defs. Ex. I), Janusz' plates were expired on December 6th. (DF 10.) He purchased new plates five days after the arrest. (DF 11.)

In his closing argument, the prosecutor framed the issue as a credibility battle between Janusz and Lucas, arguing that Janusz was a liar telling an absurd story. (Defs. Reply Ex. 2 at 66-67.) Judge Dernbach granted the motion to quash finding Lucas' explanation of what happened to be unusual. Here is the key part of his ruling:

> Given the shortage of police officers in the 15th District, on an anonymous phone call that states only that a grey Toyota truck was going to be at 4800 Roosevelt Road involved in drugs, three (3) police officers go over to Cicero and Roosevelt Road to set up a surveillance. They see the Defendant in a black Toyota. They see him parked for 10 minutes in the gas station. They then approach him. For what purpose? Is this Terry? Obviously, the State would say that they were not arresting him at that point. The State's position is that he is not arrested until this girl says the drugs – those are his drugs. Those drugs, of course, at that time are sitting next to the girl in the car or next to the girl where she had just gotten out of the car. I find it unusual that, if two (2) people are in a car and the police officer walks up to one and the person sitting in the passenger's seat says, "Oh, look, there is drugs sitting next to me," that they say, "Okay, you go home, we are going to arrest somebody else."
>
> * * *
>
> There is a shortage of police officers in the 15th District, and having people come in on nothing more than a cold call to the police station that this will happen, to approach a guy in Cicero, in another jurisdiction, -- the expired license plate had nothing to do with it. That was an afterthought. Nobody ever testified that they observed an expired license plate when they were sitting on the Chicago side, on Roosevelt Road, watching the Defendant pace around his Toyota. They approach a car that does not fit the description of the anonymous phone call in another jurisdiction.

(*Id.* at 75-76.) Immediately after Judge Dernbach granted the motion, the prosecution in open court dropped the charges against Janusz.

It is worth pausing here to note that each side has accused the other side's main witness of lying under oath. First, as to Janusz, he stated clearly at the motion to quash hearing that his license plates were current on the night of the arrest. Yet, the evidence submitted in this case shows both that his plates were expired *and* that he got new ones five days after the arrest. Although Judge Dernbach did not find this fact significant to his ruling, he did take it as true in his analysis that the plates were in fact expired. This evidence thus suggests Janusz lied under oath on this potentially significant issue relating to probable cause. In addition, as

noted above, Janusz stated in the motion to quash hearing that he initially met Siragusa at a Bally's Health Club whereas he testified in his deposition in this case that he met her at the gas station parking lot where she allegedly was dropped off by defendant George, a fact which Janusz now relies on as a key piece of evidence in his conspiracy claim. Again, this evidence suggests Janusz lied under oath. Second, as for defendant Lucas, he made several statements at the motion to quash hearing that gave the strong impression that the substance found in the cup in the car was in fact cocaine. *See* D. Reply Ex. 2 at 40 ("I walked back to the truck, retrieved the cocaine."); at 63 ("I recovered the cocaine in the vehicle, yes."). However, based on evidence submitted in this case, we now know that the Lab Report indicated this substance was *not* cocaine. (*See* Pl. Ex. 27), a point Lucas confirmed in his deposition in this case (Pl. Ex. 6 at 179 ("The suspect cocaine that I found in the car was negative. [] I made a mistake.")). The Lab report was sent to Lucas on or around December 21, 2001, well before the motion to quash hearing in October 2002. More significantly, Lucas testified to the grand jury in this case five days after receiving the Lab report and stated the following:

> Q. Officer, in regard to the suspect cocaine that was recovered from the defendant's vehicle, was that inventoried and sent to the Illinois State Police crime lab for analysis?
>
> A. Yes, it was.
>
> Q. Officer, to the best of your knowledge, did that substance weigh .1 gram all of which was tested and tested positive for cocaine?
>
> A. Yes.

(Pl. Ex. 15 at 8.) Lucas' affirmative representation that substance testified positive for cocaine, combined with his later deposition testimony that it did not, strongly suggest he lied to the grand jury and arguably to Judge Dernbach.

After the charges were dropped at the motion to quash hearing, Janusz filed two lawsuits. First, in state court he sued Keystone and two employees for breach of contract, defamation, and intentional infliction of emotional distress. He sought damages for exacerbation of his pre-existing bipolar disorder and for the onset of post-traumatic stress syndrome. Second, Janusz filed his § 1983 and state law claims here. The two cases proceeded on parallel tracks with extensive overlapping discovery. The state case was tried first. In 2009, a jury awarded Janusz over $3 million in damages. Further discovery proceeded in this court, and the defendants then filed the present summary judgment motion, which the parties have briefed and have submitted a large stack of documents supporting their arguments.

Defendants' motion does not seek to avoid a trial altogether, but instead seeks to chip away certain claims against certain defendants and to cut out a potentially significant portion of plaintiff's damages claims. There are eight arguments altogether. Defendants concede that the core issues about what happened -- whether Lucas framed Janusz on drug charges and whether he coerced him into signing a consent to search form -- are fact disputes which must be resolved by a jury. *See* Defs. Mem. at 6 ("Without a doubt, there are factual disputes regarding what transpired between Plaintiff and Officers Lucas, George and Liberti leading to his arrest for possession of narcotics at the gas station.").

Although defendants concede that plaintiff has enough evidence to show that Lucas planted drugs (among other things), it is still worthwhile to summarize plaintiff's argument on this key point because it anchors many of his arguments here. Janusz believes the four police officers were in cahoots with the Morizzo brothers to taint him as a witness in the *Keystone* litigation and used Siragusa to set him up. His case relies on what he believes is the suspicious timing and handling of his arrest. How did the officers know he would be at this particular gas station at this particular time, given that he had been at a hotel for four

hours before with Siragusa? Who could have tipped them off other than her? And why did officers focus single-mindedly on Janusz and virtually ignore Siragusa? The anonymous tipster did not identify the person as a male or female; Siragusa had been using heroin earlier in the day; she had been arrested for drugs several times; she had equal access to the drugs. Despite these facts, police let her go, did not even write down her name or phone number, did not run a background check on her which they could have done from their car, and later did not include her name in the police report. Moreover, officers showed no interest in waiting to see if a drug transaction took place and approached Janusz while he was just standing about, thereby failing to capture the other participant in the deal. They also showed no interest in following up on leads about the possible drug deals during the day which Siragusa supposedly described. For example, Lucas claims Siragusa said that Janusz and another male were together in the hotel room at one point, but Lucas never sought to follow up on this or other leads. Judge Dernbach, who heard Lucas testify directly, noted many of the same concerns. The jury in the civil trial obviously believed some of Janusz's testimony as it awarded him over $3 million in damages. (To be fair, we do not know much about the specific evidence submitted in that case, although defendants argue below that the proceeding covered much of the same basic ground as this case.) Also, Siragusa's testimony conflicts in several places with Lucas' testimony, and she testified that she found it odd how the police suddenly pulled up on them in the gas station parking lot. (Defs. Ex. F at 41.) The officers generally try to explain away the anomalies by essentially admitting that they did not follow the proper police procedures with Siragusa. However, this "sloppy police work" argument is one the jury should decide. As plaintiff succinctly poses the issue (Pl. Resp. at 23): "Was all this just a series of strange, coincidental and unfortunate events for Janusz or was it something more? At the very least, the evidence of a 'set up' is sufficient to let the jury observe the witnesses and view the exhibits to determine who is lying[.]"

     In addition, Janusz has some direct evidence. He claims, for example, he saw Lucas put the (fake) drugs into the coffee cup. He experienced Lucas slamming him down in the police station and heard Lucas and George threaten him with gang rape in prison.

     To be sure, Janusz's case has a number of potential weaknesses. As noted above, his credibility may be attacked given that it appears he lied twice about key points in the motion to quash hearing. A jury may find his willingness to change his story raises doubt about all of his testimony. Also, as defendants point out, neither the Morizzo brothers nor Grizzoffi nor Siragusa admitted ever knowing these officers. Although Siragusa's testimony conflicts in places with Lucas' testimony, she at the same time denied having a pager or in any way participating in a conspiracy. In the end, because we must under Rule 56 give reasonable inferences to plaintiff's version of events, we will assume for purposes of this ruling that these police officers attempted to frame plaintiff by planting fake evidence, by lying under oath, and by using threats of violence.

### Arguments

     One preliminary issue. After briefing on summary judgment, plaintiff moved for leave to file a fourth amended complaint seeking to add a claim (Count XII) that defendants Lucas and George unlawfully searched his vehicle. These allegations were already in the third amended complaint, but plaintiff did not include them as a separate count. Defendants addressed the implied claim in their opening summary judgment brief, and have not sought to oppose the current motion. The motion is therefore granted. We now address defendants' eight arguments (using the number-labeling system in plaintiff's brief).

     **Argument 1 -- False Arrest and the Expired Plates (Count XI).** Defendants seek to dismiss the false arrest claim by arguing that, even if they did not have probable cause to arrest plaintiff on drug charges, they did indisputably have probable cause to arrest him for the expired license plate. They concede that they did not arrest him on such charges but argue that the mere fact that they *could have* arrested him is enough. Defendants rely on *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) and *Davenpeck v. Alford*, 543 U.S. 146, 153 (2004). The Supreme Court held that if the officers have probable cause to believe a person has committed *any* crime, they have probable cause to arrest the person on additional or different charges for which there was no probable cause and may do so even if the crime is only a "very minor offense" such as

failure to wear a seat belt. (Def. Reply at 3.) The Supreme Court has made clear over the years that the probable cause inquiry is an *objective* test and that "the subjective motivations of the officer do not invalidate a search otherwise supported by probable cause." *Carmichael v. Village of Palatine, Illinois*, 605 F.3d 451, 457 (7th Cir. 2010) (analyzing *Davenpeck*). Although the defendant officer's subjective motivations are irrelevant, the court still looks at the facts as they would have been seen by a reasonable officer in the same position. *Id.*

Plaintiff raises three arguments in response. He first argues that driving on an expired license plate does not provide probable cause under Illinois law to arrest him. Next he argues that a factual question exists about whether the officers only noticed the plates until after they arrested him. Third, he argues that defendants are collaterally estopped from relitigating the issue because Judge Dernbach already found no probable cause existed. We are not persuaded by the first and third argument for the reasons adequately explained in defendants' reply brief at pp. 3-6 and pp. 9-11. However, we agree with plaintiff's second argument that a fact question exists about when the officers noticed the plates.

To begin with, Judge Dernbach, who had the benefit of listening to live testimony, found that the expired license plate was an "afterthought," suggesting he did not completely believe Lucas. Related to this point, plaintiff's case rests on the larger conspiracy allegation that these officers have lied and are continuing to lie to try to cover up their wrongdoing. A jury therefore could reasonably disbelieve the officers' claim that they saw the plates initially and believe instead that they are now lying to cover up their wrongdoing. Finally, there is circumstantial evidence (the plate was dirty, the officers were 200 feet away according to plaintiff, and it was dark outside) suggesting they may not have seen the plate initially. We recognize that the test requires us to assess what a reasonable officer might have seen, but this inquiry is entangled with the assessment of the credibility of the officers because they are the only source we have as to what a reasonable officer would have known. In short, a jury must determine the factual issue about what the officers knew and when they knew it.

This conclusion finds support from the Seventh Circuit's decision in *Carmichael v. Village of Palatine, Illinois*, 605 F.3d 451 (7th Cir. 2010), a factually similar case involving a drug arrest where officers claimed probable cause existed because of a missing front license plate. Reversing summary judgment, the Seventh Circuit held that the district court "misapprehended" the factual record. *Id.* at 458. The officers in *Carmichael* admitted they did not know about the missing license plate until after the "relevant Fourth Amendment decision [had] been made." *Id.* (noting that the objective test is "not meant to give an arresting officer the added benefit of any facts that come to light after a relevant Fourth Amendment decision has been made"). Defendants here argue that the admission by the officers in *Carmichael* distinguishes that case because here there is no such admission. While true, a jury still could disbelieve the officers for the reasons already stated above and, if so, this case would then be on the same footing as *Carmichael*.

**Argument 2 -- False Arrest As to Defendant Mugavero-Lucas.** Defendants argue that defendant Mugavero-Lucas was not at the parking lot when plaintiff was arrested and therefore cannot be liable for plaintiff's arrest. In response, plaintiff argues that Mugavero-Lucas suspiciously showed up at the 15th District station just in time to participate in the illegal search of Janusz's apartment, that she stole his watch during the search, and that she prepared an inaccurate arrest report. In short, plaintiff is alleging that she was in on the plan and knew before the arrest that he would be set up. Defendants counter that plaintiff is really making a conspiracy claim, which is the subject of a separate count, and argue that plaintiff must show that Mugavero-Lucas was physically present at the time of the arrest in order to have caused or participated in the deprivation. (Defs. Reply at 11-12.) While defendants' argument ultimately might prove persuasive to a jury, defendants have not cited to any case holding that physical presence is a necessary requirement. For this reason, we will leave it up to the jury to determine what role, if any, Mugavero-Lucas played in the arrest.

**Argument 3 -- Apartment Search (Count VII).** Defendants argue Liberti and Mugavero were not present when Lucas allegedly coerced plaintiff at the police station into signing the consent form and that they therefore could have reasonably believed he voluntarily consented to the search. As to Mugavero-Lucas,

plaintiff alleges she was in the bathroom at the time while he was loudly protesting about this issue and she was therefore in "close enough in proximity" to know consent was not freely given. (PF 22.) Although defendants claim this is speculative, this is a fact question for the jury. However, as to defendant Liberti, defendants have submitted evidence showing she was not present, and plaintiff has not responded. (DF 23.) Therefore, this count is dismissed as against defendant Liberti.

**Argument 4 – Vehicle Search (Count XII).** Defendants argue that the claim for the alleged illegal search of the car (to be added in the fourth amended complaint) was proper as a search incident to arrest or as an inventory search. Defendants state that they were merely following a routine procedure when impounding a vehicle after making an arrest and that they could have in good faith believed the search was proper under Supreme Court precedent. (Defs. Mem. at 10-11, *citing New York v. Belton*, 453 U.S. 454, 460 (1981).) However, in his response brief, plaintiff argues that both rationales are inapplicable because they rest on the presumption the arrest was proper. Defendants say the arrest in fact was proper, but given our ruling above on Argument 1, this argument is unavailing on summary judgment.

**Argument 5 – Conspiracy (Count V).** Both sides agree on the legal requirements for the conspiracy claim. Plaintiff must show an express or implied agreement by the defendants to deprive plaintiff of his Constitutional rights, and an actual deprivation of those rights by overt acts. *See* Defs. Mem. at 11 (*citing Vukadinovich v. Zentz*, 995 F.2d 750, 756 (7th Cir. 1993)). Defendants attack this count on multiple grounds. As with the vehicle claim, they first argue there was no false arrest because they had probable cause. This argument fails for the reason stated above.

Defendants next cite to the intra-corporate conspiracy doctrine, which generally states that a conspiracy cannot exist solely between members of the same entity, and argue that the only conspirators named as defendants are all in the Chicago police department. In response, plaintiff asserts that the conspiracy involved others outside the department, including Siragusa, the Morizzo brothers, and Grizzoffi, and argues that there is no legal requirement that he name them all as defendants. *See* Pl. Resp. at 20 (citing to cases including *Dexia Credit Local v. Rogan*, 604 F.Supp.2d 1180, 1185-86 (N.D. Ill. 2009) ("There is no requirement that a plaintiff sue every member of an alleged conspiracy; the plaintiff can choose which members to bring to court.")). In their reply, defendants offer no response. This argument is therefore waived.

Finally, defendants devote a substantial amount of their briefs arguing the facts and trying to prove that the conspiracy evidence is speculative, existing only "within Plaintiff's own mind." (Defs. Mem. at 12.) Defendants emphasize that the officers and the alleged outside conspirators all testified that the two groups did not know each other. They point out how Janusz changed his testimony from the motion to quash hearing, where he claimed he met Siragusa at a Bally's, to his deposition testimony, where he claimed defendant George dropped Siragusa off. They point to other weaknesses in plaintiff's case. As noted already, these arguments may convince a jury. But ultimately we still find this to be a fact question. If defendants agree plaintiff has evidence showing officers framed Janusz, then a question naturally arises as to why the officers would take such a risk if it was not to taint him as a witness in the *Keystone* litigation.

**Argument 6 – Abuse of Process (Count IV).** As the parties agree, an abuse of process claim under Illinois law requires (1) the existence of an ulterior purpose or motive for the use of regular court process and (2) an act in the use of the process not proper in the regular prosecution of the proceeding. (Pl. Resp. at 24, citing cases.) Plaintiff has clearly created a fact question on the first requirement of ulterior motive. His entire case rests on the assertion that defendants arrested him for the ulterior purpose of ruining his credibility in the *Keystone* litigation. As to the second requirement, plaintiff argues that defendants delayed the motion to quash hearing by not appearing in court for five months to give the Morizzo brothers time to negotiate a settlement with Keystone. (Pl. Resp. at 25; PF 32.)

In their reply brief, defendants do not contest the general assertion that delaying the hearing would be sufficient in principle to satisfy this second requirement. Instead, they argue no evidence exists that he didn't show up. *See* Defs. Reply at 18 ("[plaintiff] offers no evidence that he or the prosecutors subpoenaed the officers and they refused to come. Police Officers do not prosecute cases, they come to court when

summoned by one of the parties.") We find these arguments again rest on factual assertions which the jury should assess at trial.

**Argument 7 – Malicious Prosecution (Count III).** Defendants argue that the malicious prosecution claim should be dismissed because plaintiff cannot meet the second of the five requirements, which requires him to show that the criminal proceeding was terminated in his favor. Defendants state that the *nolle prosequi* by the prosecutor was not a favorable termination as a matter of law. We disagree. As laid out above, Judge Dernbach granted the motion to quash the arrest and in doing so found a number of suspicious facts in the way Lucas handled things. Immediately thereafter, the prosecutor dropped the charges. This is enough to go to the jury on the favorable termination element.

Defendants also argue that the malicious prosecution claim should be dismissed as to defendants Liberti and Mugavero-Lucas because there is no evidence they commenced or continued the prosecution (the first element of the claim) given that they never testified or spoke with a State's Attorney about the prosecution. (Defs. Mem. at 17.) Plaintiff argues in response that they were involved in the overall conspiracy and that Liberti was present at the Motion to Quash hearing. But plaintiff has not offered any case suggesting that these actions would be sufficient to satisfy this first requirement of a malicious prosecution claim. (Pl. Resp. at 26.) Therefore, we grant judgment to these two defendants on the malicious prosecution claim.

**Argument 8 – Damages.** Defendants argue that plaintiff cannot recover for emotional damages, permanent disability, or lost wages from losing his job because he already recovered those damages in the civil *Keystone* lawsuit where he was awarded more than $3 million in damages. Defendants claim plaintiff intends to offer the same two experts he used in *Keystone* and that they will give "identical" opinions as given there. Defendants argue plaintiff should be estopped from seeking such damages under either the single recovery rule or the doctrine of collateral estoppel. The single recovery rule, according to defendants, provides that when a plaintiff has been awarded damages in a lawsuit against one tortfeasor and then seeks to hold a second tortfeasor liable for the same injury in a subsequent lawsuit, the plaintiff may not recover damages "greater than that awarded in the first lawsuit." (Defs. Mem. at 18, *citing Saicheck v. Lupa*, 204 Ill.2d 127, 140 (2003) and *Bodam v. City of Chicago*, 241 Ill.App.3d 937, 941 (1993).) Defendants also argue these damages are barred by collateral estoppel. (*Id.*) The gist of defendants' argument is that plaintiff took the position in the *Keystone* litigation that his post-traumatic stress disorder and the exacerbation of his pre-existing bipolar disorder only arose after the combined effect of his false arrest on December 6, 2001 and his firing a month later and that there is thus only a single indivisible injury, one for which he was compensated already. Defendants point out that plaintiff's expert psychiatrist (Dr. Carl Wahlstrom) testified in the *Keystone* litigation that plaintiff's emotional damages were the result of a "cascade of events" including the arrest, employment termination, and defamation all of which cannot be separated. (*Id.*; DF 47.) And, more specifically, he testified that the arrest did not cause an immediate onset of post-traumatic stress.

Plaintiff argues that there are in fact two separate and divisible injuries – the emotional harm from the December 6th arrest and threat of gang rape and then the later and different emotional harm when plaintiff was fired in January 2002 and defamed by Keystone. Because there is not an indivisible injury, he argues neither collateral estoppel nor the single recovery rule apply. Plaintiff also argues that, even if certain of the injuries are identical, defendants have the burden of proving what portion of the jury award in the *Keystone* case is attributable to the claims for which they are liable. (Pl. Resp. at 29, *citing Thornton v. Garcini*, 888 N.E.2d 1217 (Ill. App. 2008).) Plaintiff argues defendants cannot meet this burden because the *Keystone* jury "did not explain what injuries they were compensating Janusz for when they awarded him compensatory damages for the defamation and intentional infliction of emotional distress." (*Id.*)

In their reply, defendants emphasize that they are not arguing that plaintiff is entitled to no damages in this case, "but rather than he is only entitled to those damages for which he has already been compensated." (Def. Reply at 22.) But defendants go on and argue that they are not seeking a set-off but instead are seeking the "complete elimination" of claims for emotional damages. (*Id.*) Defendants also complain that plaintiff

| STATEMENT |
|---|

has failed to provide a *specific* explanation of what damages were not covered by the *Keystone* case.

After reviewing both side's arguments, which are tucked at the end of long briefs dealing with numerous other issues, this Court is not prepared at this point to grant summary judgment to defendants and thereby completely eliminate any claims for emotional distress or wages. Neither side has provided a full discussion of the law or the facts, nor has either side provided a satisfactory method for figuring out a way to apportion the allegedly separate damage claims. Still, we note that defendants have raised a number of legitimate questions. It is clear that plaintiff cannot recover twice for the same injuries. *Thornton*, 888 N.E.2d at 1223 ("It is well settled that an injured plaintiff may receive only one full compensation for his or her injuries. Double recovery is not allowed.") (citations omitted). And plaintiff has recovered a significant amount of emotional damages in that case ($2.5 million for emotional distress). Moreover, in the *Keystone* case, both plaintiff's counsel and his expert generally treated the damages as if they were an indivisible injury which only started after the firing. It is true that in a few places, Dr. Wahlstrom referred to the false arrest as a "gateway" stressor that "possibly" could have caused post-traumatic disorder. (Defs. Ex. S at 60, 64.) But he later testified that the employment-related stressors added fuel to a "fire [that] hadn't ignited yet actually." (*Id.* at 69.) Similarly, he specifically stated that the post-traumatic stress did not start immediately after the arrest. Likewise, in plaintiff's complaint in this case, he makes statements suggesting the injuries are indivisible. *See, e.g.*, ¶ 64 (emphasis added): "As a further result of defendants' illegal acts, including but not limited to the false arrest, incarceration and threats that he would be gang raped, *and of being fired by Keystone*, Janusz now suffers from post traumatic stress syndrome, and an exacerbation of his preexisting mood disorder and anxiety conditions, which in turn has resulted in Janusz feeling powerless, humiliated, and embarrassed." Plaintiff never responds directly to these specific arguments and instead relies on his claim (based on one case) that it is defendants' burden to unravel the ambiguity from the *Keystone* case. Rather than ordering further briefing on this issue, given that we will not overseeing the trial of this case, we conclude that it is best to leave this issue open to give the Judge who eventually receives the case wide latitude to determine how to resolve this question at the upcoming trial.